1   LATHAM & WATKINS LLP
        Miles N. Ruthberg (Bar No. 086742)
2       *Miles.Ruthberg@lw.com*
        Peter Devereaux (Bar No. 119666)
3       *Peter.Devereaux@lw.com*
    633 West Fifth Street, Suite 4000
4   Los Angeles, California  90071-2007
    Telephone:  (213) 485-1234
5   Facsimile:  (213) 891-8763

6   LATHAM & WATKINS LLP
        Pamela S. Palmer (Bar No. 107590)
7       *Pamela.Palmer@lw.com*
        Michele D. Johnson (Bar No. 198298)
8       *Michele.Johnson@lw.com*
        Gal Dor (Bar No. 242933)
9       *Gal.Dor@lw.com*
    650 Town Center Drive, 20th Floor
10  Costa Mesa, CA  92626
    Telephone:  (714) 540-1235
11  Facsimile:  (714) 755-8290

12  Attorneys for Defendants

13                  UNITED STATES DISTRICT COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15                        SOUTHERN DIVISION

16

17  In re IMPAC MORTGAGE              CASE NO.:
    HOLDINGS, INC. SECURITIES         SACV-06-00031-CJC(RNBx)
18  LITIGATION
                                      CLASS ACTION
19
                                      **REPLY IN SUPPORT OF MOTION
20                                    TO DISMISS FIRST AMENDED
                                      CONSOLIDATED COMPLAINT**
21
                                      Date:      May 12, 2008
22                                    Time:      1:30 p.m.
                                      Ctrm:      9B
23
                                      The Honorable Cormac J. Carney
24                                    United States District Court Judge

25

26

27

28

1

<u>TABLE OF CONTENTS</u>

2

<u>Page</u>

I.      INTRODUCTION AND SUMMARY OF REPLY ........................... 1

3

4
II.     CASE HISTORY AND THE MORTGAGE CREDIT
        CRISIS .................................................................................. 5

5
III.    ARGUMENT .......................................................................... 8

6

7
        A.   Plaintiffs Do Not Allege Any Statement Whatsoever By
             Six Of The Eight Individual Defendants. ............................... 8

8
        B.   Plaintiffs Do Not Allege Any False Statement. ..................... 8

9
             1.   Plaintiffs Allege No Facts That Contradict Impac's
                  Report On Remediation of Internal Controls. .......... 9

10

11
             2.   The SOX Certifications Do Not Misrepresent
                  Remediation Of Internal Controls. ........................ 13

12
             3.   Plaintiffs Allege No Facts That Contradict Impac's
                  Expectation of "Solid" Loan Production. ............... 14

13

14
             4.   The PSLRA's Safe Harbor Applies To The
                  Forward-Looking Statements About "Solid" Loan
                  Production. ....................................................... 19

15
        C.   Plaintiffs Do Not Allege Scienter. ..................................... 21

16
             1.   Standard of Review ........................................... 21

17

18
             2.   Plaintiffs Allege No Facts Demonstrating Scienter
                  In Reporting Impac's Remediation of Internal
                  Controls........................................................... 22

19

20
             3.   Plaintiffs Allege No Facts Demonstrating Scienter
                  In Predicting Expectation Of "Solid" Loan
                  Production. ....................................................... 25

21

22
             4.   Plaintiffs' Insider Trading Allegations Do Not
                  Support Any Inference Of Scienter. ...................... 27

23
             5.   Plaintiffs Fail To Allege Corporate Scienter .......... 34

24
        D.   Plaintiffs Cannot Plead Loss Causation.............................. 34

25
        E.   Plaintiffs Have Not Pled Control Person Liability .............. 35

26
IV.     CONCLUSION ..................................................................... 36

27

28

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Page

*Associated Builders, Inc. v. Alabama Power Co.*,
   505 F.2d 97 (5th Cir. 1974) ........................................................................ 11, 26

*In re Astea Int'l, Inc. Sec. Litig.*,
   No. 06-1467, 2007 U.S. Dist. LEXIS 58238 (E.D. Pa. Aug. 8, 2007) ........ 29, 30

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) .................................................. 28, 31, 33

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002) ............................................................................ 13

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) ............................................................ 15

*Cutsforth v. Renschler*,
   235 F. Supp. 2d 1216 (M.D. Fla. 2002) ........................................................... 22

*In re Digi Int'l, Inc. Sec. Litig.*,
   6 F. Supp. 2d 1089 (D. Minn. 1998),
   *aff'd*, 14 Fed. Appx. 714 (8th Cir. 2001) ........................................................ 33

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) ............................ 7, 34

*In re FirstEnergy Corp. Sec. Litig.*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004) ....................................................... 18, 19

*In re Foundry Networks, Inc., Sec. Litig.*,
   No. C-00-4823, 2003 U.S. Dist. LEXIS 18200
   (N.D. Cal. Aug. 29, 2003) ................................................................................. 15

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) .......................................................................... 5, 18

*In re H&R Block Sec. Litig.*,
   No. 06-0236-CV, 2008 U.S. Dist. LEXIS 12122
   (W.D. Mo. Feb. 19, 2008) ................................................................................. 24

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...................................................................... 11, 24

*In re IMPAX Labs., Inc. Sec. Litig.*,
   No. C-04-4802, 2006 U.S. Dist. LEXIS 81420 (N.D. Cal. Mar. 1, 2006) .. 29, 33

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001) ............................................................. 33

*In re KeySpan Corp. Sec. Litig.,*
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................... 29, 30

*In re Leapfrog Enters., Inc. Sec. Litig.,*
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ....................................... 19, 20

*Lipton v. PathoGenesis Corp.,*
  284 F.3d 1027 (9th Cir. 2002) ............................................. 23, 25, 31

*In re Lockheed Martin Corp. Sec. Litig.,*
  272 F. Supp. 2d 944 (C.D. Cal. 2003) ............................................... 20

*Makor Issues  & Rights, Ltd. v. Tellabs, Inc.,*
  513 F.3d 702 (7th Cir. 2008) ............................................................ 24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.
  America West Holding Corp.,*
  320 F.3d 920 (9th Cir. 2003) ....................................................... 29, 33

*Nursing Home Pension Fund v. Oracle Corp.,*
  242 F. Supp. 2d 671 (N.D. Cal. 2002) .............................................. 31

*Ottmann v. Hanger Orthopedic Group, Inc.,*
  353 F.3d 338 (4th Cir. 2003) ............................................................ 22

*In re PEC Solutions, Inc. Sec. Litig.,*
  418 F.3d 379 (4th Cir. 2005) ............................................................ 30

*In re Party City Sec. Litig.,*
  147 F. Supp. 2d 282 (D.N.J. 2001) .............................................. 31, 32

*Ressler v. Liz Claiborne, Inc.,*
  75 F. Supp. 2d 43 (E.D.N.Y. 1998) .................................................. 30

*Santa Fe Industrial, Inc. v. Green,*
  430 U.S. 462, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977) ................... 12

*In re Secure Computing Corp. Sec. Litig.,*
  184 F. Supp. 2d 980 (N.D. Cal. 2001) .............................................. 29

*Shapiro v. UJB Finance Corp.,*
  964 F.2d 272 (3d Cir. 1992) ............................................................. 13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

iii

REPLY IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CONSOLIDATED COMPLAINT

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...........................................................21, 27, 28, 29

*In re Silicon Graphics, Inc. Sec. Litig.*,
   No. C-96-0393, 1996 U.S. Dist. LEXIS 16989
   (N.D. Cal. Sept. 25, 1996) ....................................................................................21

*In re Skechers U.S.A., Inc. Sec. Litig.*,
   No. CV-03-2094, 2004 U.S. Dist. LEXIS 12570
   (C.D. Cal. May 10, 2004) ......................................................................................20

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............................................................14, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ........................................4, 21, 24, 27

*United States v. Hartness*,
   845 F.2d 158 (8th Cir. 1988) ...............................................................................16

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) .........................................................................15, 23

*In re VeriSign, Inc. Deriv. Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ...............................................................35

*Yourish v. California Amplifier*,
   191 F.3d 983 (9th Cir. 1999) ...............................................................................23

*Ziemba v. Cascade Int'l, Inc.*,
   256 F.3d 1194 .......................................................................................................22

*In re ZZZZ Best Sec. Litig.*,
   No. CV-87-3574, 1989 U.S. Dist. LEXIS 8083
   (C.D. Cal. May 19, 1989) ......................................................................................36

**STATE CASES**

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003) ..............................................................................31

**FEDERAL STATUTES**

15 U.S.C. § 78u-4(b) ..................................................................................................8

15 U.S.C. § 78u-4(b)(1)(B) .......................................................................................9

15 U.S.C. § 78u-5(c)(1)(B)(i) .................................................................................21

iv         REPLY IN SUPPORT OF MOTION TO DISMISS
           FIRST AMENDED CONSOLIDATED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

15 U.S.C. § 78u-5(c)(1) ...................................................................................... 20, 21

15 U.S.C. § 7262 .................................................................................................... 10

17 C.F.R. § 240.13a-15(f)(1), (2), (3) ............................................................ 10, 18

18 U.S.C. § 1001, *et seq.* ...................................................................................... 16

H.R. Rep. No. 104-369 (1995) ................................................................................ 8

Sarbanes-Oxley Act ..................................................................3, 4, 8, 10, 13, 14

# I.    INTRODUCTION AND SUMMARY OF REPLY

Plaintiffs have failed, through two rounds of pleadings and motions to dismiss, to articulate a single cogent theory, supported by particularized facts, demonstrating that Impac lied to its investors.  It is clear that Plaintiffs cannot do so.  Having shifted fraud theories multiple times to no avail, their Opposition brief ("Opp.") merely rehashes the morass of conclusory contentions, conflicting positions, and non-sequiturs in their First Amended Complaint ("FAC" or "Amended Complaint").  Plaintiffs seek to hide their lack of substance by resorting to vague allegations and hyperbole.  When their few allegations of "fact" are sifted out and examined, there is nothing there to state a securities fraud claim.

After having abandoned several prior fraud theories, Plaintiffs make their last stand on two theories:  <u>one</u>, that Impac allegedly misrepresented its interim efforts to remediate deficiencies in internal controls over accounting and financial reporting, and, <u>two</u>, that Impac's CEO misrepresented Impac's expectation of continued "solid" loan production.  Opp. at 1-2.  Plaintiffs rely entirely on vague, anecdotal criticisms by a handful of anonymous former consultants and employees (the "FEs") to allege that these statements were false, and to plead Defendants' fraudulent intent.  Opp. at 3, 5, 7, 11-12.  As shown in Defendants' Opening Brief ("Defs.' Mot.") and below, Plaintiffs cannot, as matter of fact or law, state a viable securities fraud claim based on the grumblings of these anonymous commentators.

This Court has already once dismissed Plaintiffs' first fraud theory, which Plaintiffs merely reallege based on the <u>same</u> FE allegations and arguments as before.  At the start of the alleged Class Period, in its May 16, 2005 Form 10-Q, Impac reported that it had taken steps to remediate deficiencies in internal controls over financial reporting, which deficiencies had been disclosed in the pre-Class Period October 14, 2004 restatement ("Restatement").  FAC ¶¶ 54, 84.  Impac reported that its remediation efforts were <u>not</u> effective at the end of the first quarter

1    of 2005 or, indeed, at any time during the Class Period.[1]  *Id.* ¶ 52.  Impac was not

2    done, and disclosed that fact.  Investors could not have been misled.

3            Plaintiffs fall back to nit-picking Impac's disclosure of its interim

4    remediation steps.  *Id.* ¶¶ 54, 84.  The FEs' alleged comments, however, even if

5    credited, do not contradict any of these interim steps.  Their vague generalizations

6    reflect inactionable criticisms of Impac's management and disagreements about

7    how to handle the remediation process.  Opp. at 18-19; FAC ¶¶ 57-60, 70.  None of

8    the FEs claims to have communicated his or her views with any Defendant; none

9    alleges any misrepresentation or securities violation.

10           Plaintiffs' second and sole remaining theory—that Impac's CEO

11   misrepresented Impac's "expectation" that loan production would continue to be

12   "solid" in after the first quarter of 2005 —is nothing but an inactionable attempt to

13   quibble with the CEO's choice of adjectives.  Plaintiffs admit that Impac's loan

14   production subsequently increased from $4.7 billion to $5.5 billion in the second

15   quarter of 2005, proving that the CEO's prediction was right.  Opp. at 20; FAC ¶

16   64.  In any event, his expression of Impac's "expectation" was forward-looking

17   and therefore fully protected by the Safe Harbor under the PSLRA.

18           Evidently hoping that this Court will overlook the Safe Harbor, Plaintiffs

19   play games with terminology to construct an illogical argument that the CEO's

20   prediction was false.  Plaintiffs contend that deficiencies in Impac's internal

21   controls over <u>financial reporting</u> somehow led to unspecified deterioration in loan

22   "quality" which, according to Plaintiffs, meant that loan production could not

23   continue to be "solid."  Opp. at 11; FAC ¶ 11.  This syllogism makes no sense.

24

25   [1]  Plaintiffs do not dispute that Impac had fully remediated its internal controls
     four months after the end of the Class Period, as of year end December 31,
26   2005, as confirmed in the Ernst & Young LLP auditor's report.  Defendants'
     Request for Judicial Notice ("RJN") Ex. Q at Q-195-196 (Mar. 31, 2006 Form
27   10-K).  This confirmation affirmed the remediation decisions of Impac's
     management despite the FEs' criticisms.
28

1   The deficiencies in Impac's internal controls concerned only <u>accounting and</u>
2   <u>financial reporting</u>, not the making of loans.  FAC ¶ 52.  Plaintiffs allege no facts
3   to show that the CEO's prediction was false when made.

4        Plaintiffs continue a parade of non-sequiturs by arguing that loan production
5   could not be "solid" because Impac made loans without "verifying" stated
6   income—even though non-verification of income was a normal characteristic of
7   Impac's Alt-A mortgages, as Plaintiffs admit.  *Id.* ¶¶ 45-46, 63.  Plaintiffs then
8   make factually contradictory allegations that Impac either monitored loan quality
9   (*id.* ¶¶ 76, 81(c)) or could not monitor loan quality (supposedly due to the
10  inapplicable control deficiencies) (*id.* ¶¶ 56, 66, 81(a)).  For support, Plaintiffs look
11  to the vague criticisms of Impac's lending practices and corporate culture by
12  anonymous FEs.  *Id.* ¶¶ 65, 69.  These defective allegations do not demonstrate
13  that Impac's expectation of continued "solid" loan production in 2005 was false.

14       In addition to Plaintiffs' inability to plead any material misstatement, the
15  Amended Complaint fails on a host of other grounds:

16       •   To the extent Plaintiffs merely criticize how Impac handled
17  remediation of internal control weaknesses or lending operations, this is criticism
18  of management and not a securities claim under Section 10(b).  As a matter of
19  established law, which Plaintiffs obliquely acknowledge (Opp. at 15), they cannot
20  package purported management shortcomings as securities disclosure claims.

21       •   As shown in Defendants' Opening Brief, Plaintiffs have not alleged
22  that six of the eight Individual Defendants made any false statement.  No one other
23  than the CEO and former CFO are alleged to have spoken for Impac.  Plaintiffs
24  concede by silence that the "group pleading" doctrine did not survive the PSLRA.
25  Defs.' Mot. at 30-31.  On this basis alone, the Amended Complaint must be
26  dismissed as to Ashmore, Verdugo, Morrison, Walsh, Fillips, and Abrams.

27       •   Plaintiffs have no cogent answer to Defendants' showing that the
28  Sarbanes-Oxley Act ("SOX") certifications signed by the CEO and former CFO

1   were required by federal securities regulations, and that the SOX recitals <u>confirm</u>

2   the very internal control deficiencies that Plaintiffs allege were concealed.  These

3   SOX certifications do not demonstrate any false statement or scienter.

4         •   Plaintiffs have alleged no other facts supporting an inference of

5   fraudulent intent by any Defendant, much less a "strong" inference that is "cogent

6   and at least as compelling as any opposing inference of nonfraudulent intent."

7   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2505, 168 L. Ed. 2d

8   179, 188 (2007).  Plaintiffs rely entirely on the FEs, but do not allege that any of

9   their purported comments or observations—which do not even contradict Impac's

10  disclosures—came to the attention of any Defendant during the Class Period.

11        •   Nor do Plaintiffs salvage their argument, already once rejected by

12  this Court, that Defendants' stock trades suggest any motive to defraud investors.

13  The only "strong inference" from the public trading records, on which all parties

14  rely, is that Defendants exercised stock options during an open trading window

15  between quarterly reports when they would not be expected to have material non-

16  public information.  Far from "bailing out" on secret knowledge of any upcoming

17  bad news, all of the Defendants either <u>bought</u> more stock than they sold, thus

18  increasing their holdings, or maintained their holdings at the same level.  Defs.'

19  Mot. at 40.  The CEO only bought stock during the Class Period and sold none.

20  These judicially noticeable facts counter any inference of scienter.

21        •   Plaintiffs have utterly failed to allege an essential element of their

22  claim:  loss causation.  Impac made the <u>same</u> disclosures about internal control

23  weaknesses, remediation steps, and "solid" loan production at both the start and the

24  end of the Class Period.  FAC ¶¶ 91, 93.  As Plaintiffs concede, there were no

25  adverse "revelations" concerning internal controls or loan production at the close

26  of the Class Period.  Opp. at 10, 39.  Absent a corrective disclosure, a drop in the

27  stock price cannot have been caused by any prior false statement.  As Plaintiffs

28  allege, the stock price dropped on August 9, 2005 on news that adverse interest

rates and other industry-wide factors had negatively affected Impac's performance and would result in lower dividends.  FAC ¶ 93.  Thus, the stock price decline that Plaintiffs claim as their loss (Opp. at 10, 39) cannot have been <u>caused</u> by any alleged misrepresentation about internal controls, remediation steps, or loan production.  Failure to plead "loss causation" is fatal to Plaintiffs' claim.

## II.   CASE HISTORY AND THE MORTGAGE CREDIT CRISIS

Plaintiffs filed this suit on speculation that has not panned out in their favor. They sued in January 2006, evidently hoping to exploit the decline in Impac's stock price on August 9, 2005, when Impac reported its second quarter 2005 results.  But as Plaintiffs' allegations reflect, Impac's results were negatively impacted by external, industry-wide factors that were not unique to Impac's business.  FAC ¶¶ 91, 93.  Plaintiffs have searched in vain for some "lie" in Impac's May 2005 report on the first quarter of 2005 that might explain the later downturn, but there is none to be found.  Plaintiffs' strategy of attempting to plead "fraud by hindsight" was condemned more than a decade ago by Congress and the federal courts.  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 n.8 (9th Cir. 1994).  The strategy simply does not work.

Plaintiffs' decision to sue first, then look for a claim is evident in the fact that they have already advanced and jettisoned multiple fraud theories, although they amended their complaint only once.  In response to Defendants' Motion to Dismiss the initial consolidated complaint ("CC"), Plaintiffs unilaterally dropped their two leading theories:  <u>one</u>, that in reporting the first quarter 2005 results, Impac hid "macroeconomic factors," such as "increases in short term interest rates, continued flattening of the yield curve, heightened prepayment speeds, and competitive pricing pressures" (CC ¶¶ 38(e), 94(e)); and, <u>two</u>, that Impac misreported the mark-to-market value of its derivative instruments (*id.* ¶¶ 38(a), 94(a)).  Plaintiffs had no valid basis for asserting these claims.

In defending their initial complaint, Plaintiffs ultimately settled on three theories.  First, they attacked the CEO's forward-looking statement during the May 16, 2005 conference call that Impac's "interest rate risk management" would "continue to protect the adjusted net interest margins from dramatic spikes and short-term interest rates."  *Id.* ¶¶ 20, 27, 38, 94.  The Court dismissed this claim because Plaintiffs had "ignored the PSLRA's Safe Harbor as it applies to Mr. Tomkinson's statement regarding rate risk management."  Order Granting Defendants' Motion to Dismiss (Sept. 19, 2007) ("9/19/07 Order") at 1.  Plaintiffs dropped the claim from the Amended Complaint.

Second, Plaintiffs made the same argument reiterated here that Impac's May 16, 2005 Form 10-Q misrepresented its interim efforts to remediate internal control deficiencies identified in the October 2004 Restatement.  CC ¶¶ 29, 84.  The Court dismissed this claim as well because "the Complaint fails to allege any false statement."  9/19/07 Order at 1.  Plaintiffs' reiteration of this theory in the Amended Complaint relies on the <u>same</u> arguments and anonymous witnesses on which Plaintiffs relied in the defunct initial complaint.  *Compare* CC ¶¶ 30-33, 59-60, 88-90 *with* FAC ¶¶ 64-65, 68, 71-75.

Third, Plaintiffs initially asserted that "the Company's lack of internal control also affected the quality of its loans" and that Impac acquired increasing quantities of "bad" loans "procured by fraud."  CC ¶¶ 21, 38(c).  The Court dismissed this claim because, again, "the Complaint fails to allege any false statement."  9/19/07 Order at 1.  Plaintiffs have reasserted this theory in the Amended Complaint, again relying on the <u>same</u> anonymous witnesses, but with one new twist.  They now allege that the CEO made "false statements" in the May 13, 2005 press release and May 16, 2005 conference call that Impac expected continued "solid" loan production in 2005.  FAC ¶¶ 79, 81-83.

In seeking to defend their last remaining fraud theories, Plaintiffs make a telling admission that underscores why this ill-conceived lawsuit should be

1    dismissed once and for all.  It has not escaped Plaintiffs' notice that <u>after</u> the
2    alleged Class Period, the U.S. mortgage industry spiraled into crisis.  The industry
3    was devastated by falling real estate values and rising default rates that culminated
4    in total collapse of the secondary market for mortgage related debt in 2007.  Impac
5    was deeply affected by these powerful external events and withdrew from Alt-A
6    mortgage lending in August 2007.  FAC ¶ 101.  Plaintiffs' admission is their plea
7    to this Court that they should not be "punished for bringing this suit before the
8    mortgage industry crisis reached a full boiling point, *<u>as forces which caused the</u>*
9    *<u>industry's current meltdown are the same forces in effect in 2005 at the end of the</u>*
10   *<u>Class Period</u>*."  Opp. at 4 (emphasis added).  Plaintiffs starkly concede that adverse
11   industry-wide market conditions, <u>not</u> securities fraud, caused Impac's stock price
12   drop at the end of the Class Period.
13          This case has never been driven by any real evidence of misrepresentations
14   or fraud.  Plaintiffs merely seek to foist the fully disclosed risks of their investment
15   upon Impac and its managers.  Plaintiffs' problem is that Impac was unfailingly
16   honest with its investors.  Impac accurately accounted for its mortgage business
17   during the Class Period, disclosed the continuing weaknesses in its internal
18   controls over financial reporting, and warned investors about the risks of Alt-A
19   mortgage lending, including the very risks that came to pass.  Impac's disclosures
20   are summarized in Defendants' Appendix of Disclosures (RJN Ex. A), none of
21   which Plaintiffs dispute, or even address, in their Opposition.  The securities laws
22   require only truthful disclosure, which Impac delivered in abundance, not
23   guarantees.  Contrary to Plaintiffs' apparent expectations, the federal securities
24   laws are not a "scheme of investor's insurance."  *Dura Pharms., Inc. v. Broudo*,
25   544 U.S. 336, 345, 125 S. Ct. 1627, 1633, 161 L. Ed. 2d 577, 587 (2005).
26          Congress appointed the federal courts as gatekeepers under the PSLRA to
27   curb "abuse in private securities lawsuits" by dismissing cases—such as this—that
28   fail to meet the stringent pleading standards necessary to state a fraud claim.  15

1  U.S.C. § 78u-4(b); H.R. REP. NO. 104-369, at 301 (1995) (Conf. Rep.).  In keeping

2  with that mandate, this action should be dismissed once and for all because

3  Plaintiffs have not carried their burden of pleading particularized facts

4  demonstrating a securities fraud.

5  **III.   ARGUMENT**

6      **A.   Plaintiffs Do Not Allege Any Statement Whatsoever By Six Of**

7         **The Eight Individual Defendants.**

8        Plaintiffs do not allege that any of the Individual Defendants, other than

9  CEO Tomkinson and former CFO Johnson, made any false statement.  As shown

10  in Defendants' Opening Brief, the overwhelming weight of authority is that the

11  group-published pleading shortcut is unavailable under the PSLRA to plead that

12  Individual Defendants made Impac's statements.  Defs.' Mot. at 30-31.  Plaintiffs

13  do not even attempt to address this argument, and thus concede it.  *See In re ZZZZ*

14  *Best Sec. Litig.*, No. CV-87-3574, 1989 U.S. Dist. LEXIS 8083, at *9 (C.D. Cal.

15  May 19, 1989) ("this Court can only look upon such silence as acquiescence").  On

16  this ground, all claims against Ashmore, Verdugo, Morrison, Walsh, Filipps, and

17  Abrams must be dismissed, and all claims against Tomkinson and Johnson for

18  statements not attributed to them personally also must be dismissed.

19      **B.   Plaintiffs Do Not Allege Any False Statement.**

20        To recap the allegations, Plaintiffs' Amended Complaint flags four

21  statements as allegedly misleading.  Plaintiffs attack two statements on the theory

22  that Impac misrepresented its interim remediation steps:  (1) the list of steps in

23  Impac's May 16, 2005 Form 10-Q SEC reporting Impac's first quarter 2005 (FAC

24  ¶¶ 84, 85), and (2) the CEO's and CFO's SOX certifications attached to the May

25  16, 2005 Form 10-Q.  *Id.* ¶ 86.  Plaintiffs attack the other two statements on the

26  theory that the CEO misrepresented Impac's expectation for continued "solid" loan

27  production:  (3) the CEO's statement in the May 13, 2005 press release that "we

28  continue to expect solid loan acquisitions and originations" (*id.* ¶¶ 79, 81), and

1    (4) the CEO's statement during the May 16, 2005 conference call that "we remain

2    optimistic for continued solid loan production for 2005." *Id.* ¶¶ 82, 83.[2]  Plaintiffs'

3    Opposition largely cuts and pastes from contentions in the Amended Complaint

4    and does not identify any other factual allegations showing that any of these

5    statements were false when made.

6              **1.    Plaintiffs Allege No Facts That Contradict Impac's Report
                        On Remediation of Internal Controls.**
7

8              This Court already dismissed Plaintiffs' claim that Impac misled its

9    investors by listing remediation steps it had taken as of the first quarter of 2005.

10   9/19/07 Order at 1.  The Amended Complaint reasserts the <u>same</u> claim based on

11   the <u>same</u> allegations as before and, therefore, is still insufficient to allege a false

12   statement.  Plaintiffs' Opposition points to nothing new to salvage the claim.[3]

13             First, Plaintiffs do not dispute that before, during, and after the Class Period,

14   Impac disclosed that its "system of internal controls over financial reporting and

15   disclosure control and procedures was <u>ineffective</u>" and described the specific

16   accounting control weaknesses.  RJN Exs. D at D-89, F at F-107-108, G at G-141-

17   [2]   In their Opposition, but not in their Amended Complaint, Plaintiffs apparently
18        purport to challenge CEO Tomkinson's statement that "we continue to remain
          confident that the strength of our long-term investment portfolio, [and] our
19        ability to change strategies by retaining or selling mortgages . . . will continue
          to provide us with the opportunity to deliver consistent, reliable dividends to
20        our stockholders."  Opp. at 6.  Although the Amended Complaint quotes this
          statement, it does not allege that the statement was false or misleading.  FAC
21        ¶¶ 82-83.  This omission is fatal to Plaintiffs' attempt to now claim that the
          statement is false.  Under the PSLRA, a complaint must "specify each statement
22        alleged to have been misleading [and] the reason or reasons why the statement
          is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  Plaintiffs' continually shifting
23        arguments evidence both their inability to find a false statement and their failure
          to satisfy the pleading burdens of the PSLRA.

24   [3]   Although Plaintiffs say that Impac's statements about "the actual state of their
25        internal controls" were false (Opp. at 1), presumably Plaintiffs mean only that
          the alleged remedial measures had not been taken.  Plaintiffs identify no
26        allegedly deficient controls other than those spelled out in Impac's disclosures.
          FAC ¶ 52.  Indeed, Plaintiffs argue that "[t]he crux of plaintiffs' allegations is
27        *not* that defendants failed to disclose Impac's prior internal control problem, but
          that defendants misled investors about the remedial efforts Impac implemented
28        to address those problems."  Opp. at 2.

142, S at S-207 (emphasis added).  Before the Class Period, in light of the October 2004 Restatement, Impac and its auditors re-evaluated the effectiveness of internal controls over financial reporting as of the year ended December 31, 2003 under SOX § 404.  15 U.S.C. § 7262.  Predictably, in light of the Restatement, they determined that those controls were "ineffective."  RJN Ex. D at D-89.

On May 16, 2005, at the start of the alleged Class Period, Impac filed an amended Form 10-K/A for the year ended December 31, 2004, which included management's assessment of "internal control over financial reporting" under SOX § 404.  RJN Ex. G at G-141-142.  Impac again reported that "due to the reported material weakness . . . internal control over financial reporting is not effective as of December 31, 2004 . . . ."  *Id*. at G-142 (emphasis added).  Impac then recapped the same material weaknesses identified in the Restatement (*i.e.*, insufficient accounting-related documentation and staff).  FAC ¶¶ 54, 84; RJN Ex. G at G-140-141.  Impac also disclosed an additional material weakness that had not resulted in any financial statement errors (*i.e.*, "access and change control over end-user computing spreadsheets").  RJN Ex. G at G-157.

SOX § 404 only requires management to make an annual report assessing "internal control over financial reporting."  15 U.S.C. § 7262(a); 17 C.F.R. § 240.13a-15.  By federal regulation, Impac's next annual assessment would be as of the year ended December 31, 2005—two quarters after the close of the Class Period.  Skipping ahead, Impac's Form 10-K annual report for the year ended 2005 (filed in March 2006) reported management's assessment that the material weaknesses had been fully remediated as of December 31, 2005, and that "internal control over financial reporting" was adequate.  RJN Ex. Q at Q-196.  Impac's external financial statement auditors, Ernst & Young LLP, gave their unqualified agreement.  *Id*. Ex. Q at Q-195-196.  Until then, every quarterly SEC report filed by Impac for 2005—including at the start and end of the alleged Class Period— reiterated the same material weaknesses, and confirmed that Impac's remediation

1    work was not done and that its efforts were <u>not</u> yet effective.  Investors could not

2    have been misled.

3          Second, Plaintiffs likewise do not dispute that Impac reported the <u>same</u>

4    interim steps to remedy internal controls before, during, and after the Class Period.

5    Defs.' Mot at 7, 11.  The same remedial measures were disclosed by Impac before

6    the Class Period (RJN Ex. D), which Plaintiffs do not challenge, at the start of the

7    Class Period, which Plaintiffs allege as false, and at the end of the Class Period,

8    when Plaintiffs declare that "the truth" was revealed.  FAC ¶ 93; RJN Ex. C.  The

9    same remediation disclosures cannot be both misleading and not misleading.

10   These contrary allegations fundamentally undercut Plaintiffs' contention that

11   Impac's remediation disclosures were <u>ever</u> misleading.  Plaintiffs ignore this

12   critical logical flaw in their claim.  *See Associated Builders, Inc. v. Alabama Power*

13   *Co.*, 505 F.2d 97, 100 (5th Cir. 1974) (holding that conclusory assertions

14   contradicted by facts are "not admitted as true").

15         Third, the four FEs who supposedly criticize Impac's remediation efforts,

16   FEs 1, 2, 5, and 8, are the same anonymous critics whose observations failed to

17   support a sustainable claim of falsity in the original complaint.  *Compare* CC ¶¶

18   30-31, 60(a), (b), (h) *with* FAC ¶¶ 58-61, 70, 73.  Nothing these FEs say shows that

19   Impac lied about any or all of the 13 remediation steps that Impac reported.  *See*

20   Defs.' Mot. at 21-22; FAC ¶¶ 57-60, 70, 73-75.[4]  Plaintiffs' contention that Impac

21   
_____

22   [4]   The FEs' allegations are uniformly vague, undercutting their credibility and
     weight.  Defs.' Mot. at 22, citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d
23   753, 757 (7th Cir. 2007).  That said, even if fully credited, the FEs' allegations
     do not belie Impac's disclosures.  FE1 allegedly complains that Impac's
24   personnel were "unqualified" and "uncooperative" and did not give him "proper
     access to perform any independent testing."  FAC ¶ 58.  FE2 complains that
25   Impac was resistant to change and refused to accept his/her suggestions.  *Id.*
     ¶ 60.  FE5 complains that Impac "refused to follow [his/her] recommendations"
26   and re-wrote what FE5 had written.  *Id.* ¶ 70.  FE8 purportedly observed that
     Defendants Verdugo and Johnson made some unspecified correction to the
27   second quarter 2005 Form 10-Q "seconds" before the filing deadline.  *Id.* ¶ 74.
     These vague and petty allegations and observations do not show that Impac
28   failed to take any of the reported remediation steps.  *See* Defs.' Mot. at 21-22.

"thwarted" the purported efforts of these FEs and "made no legitimate efforts" to fix the internal control deficiencies (Opp. at 5, 15, 18, 30) is hyperbole.  Indeed, the fact that Impac even hired these FEs further supports Impac's report that it was hiring resources to help.  Defs.' Mot. at 22.  Plaintiffs have never cited any laws or regulations prescribing how Impac was to document, test, or remediate internal controls.  As Defendants have repeatedly pointed out, no such laws or regulations exist.  The extent to which Impac's managers chose to follow the suggestions of any of these FEs, or to rely on their work, or not, was entirely Impac's prerogative.  Confirming the good judgment of Impac's management in this regard, Impac successfully accomplished complete remediation on time as of year end 2005.

Finally, Plaintiffs concede the general principle that alleged management deficiencies are not subject to Section 10(b) disclosure claims under the *Sante Fe* doctrine.  *See* Opp. at 15; *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479, 97 S. Ct. 1292, 1304, 51 L. Ed. 2d 480, 496 (1977) (holding that duties and liabilities of management are province of state law, not federal securities laws); Defs.' Mot. at 19.  Thus, to the extent that Plaintiffs' allegations boil down to contentions that Impac's managers made mistakes—*e.g.*, by declining to follow the FEs' advice, or making some unspecified error that required a last-minute change to an SEC filing —these complaints are not matters subject to any securities claim.

Plaintiffs argue that the *Santa Fe* doctrine does not apply because Impac spoke "half truths" about its efforts to fix the internal control problems and, therefore, was required to tell the "full" story to avoid misleading investors.  Opp. at 15.  This argument is illusory.  What more disclosure should Impac supposedly have made?  That it might choose not to follow all of the recommendations of its new-hires and consultants?  That it might not use all of their technical write-ups or work product?  That its officers might have to make last-minute edits to SEC filings?  Obviously not.  These are matters of ordinary business management which, under *Sante Fe*, are not regulated by the securities laws or subject to any

REPLY IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CONSOLIDATED COMPLAINT

1    disclosure obligation.  430 U.S. at 479; *see also Shapiro v. UJB Fin. Corp.*, 964

2    F.2d 272, 283 (3d Cir. 1992) ("it is not a violation of the securities laws to simply

3    fail to . . . provide sufficient internal controls");[5] *Brody v. Transitional Hospitals*

4    *Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (no duty to disclose immaterial details)

5    (cited in Opp. at 15).

6                **2.      The SOX Certifications Do Not Misrepresent Remediation**
                 **Of Internal Controls.**
7

8          This Court previously dismissed Plaintiffs' claim that the CEO's and CFO's

9    SOX certifications appended to Impac's May 16, 2005 Form 10-Q were false.

10   9/17/07 Order at 1.  The Amended Complaint repeats the allegations and adds

11   nothing new.  Opp. at 18-19; FAC ¶ 87.  As discussed in Defendants' Opening

12   Brief, the SOX certifications are regulatory forms required in order to comply with

13   SEC regulations, and they affirm the signers' belief in the accuracy of the SEC

14   filings to which they are attached.  Defs.' Mot. at 23.  The May 16, 2005 SEC

15   filing to which the SOX certifications were attached disclosed the weaknesses in

16   Impac's internal controls, and the SOX certifications confirmed those disclosures.

17         Plaintiffs argue that the SOX certifications, like the underlying SEC filing,

18   implicitly misrepresented Impac's interim remediation steps.  Opp. at 18-19.  This

19   argument is baseless for the reasons already discussed.  Plaintiffs cite, for example,

20   FE8's alleged observation that Defendants Verdugo and Johnson made last-minute

21   changes to the second quarter 2005 Form 10-Q.  *Id*. at 18.  This vague information

22   does not contradict Impac's report that it had implemented "new control

23   procedures around our quarterly reporting process."  FAC ¶ 54.  FE8 provides no

24   details about the last-minute corrections, much less information that would support

25   any rational conclusion that Impac had not, in fact, implemented any "new control

26   [5]  Plaintiffs argue *Shapiro* does not apply because Defendants made false
         statements about their efforts to fix their internal control problems.  Opp. at 16;
27       Defs.' Mot. at 20.  But, as shown above, Plaintiffs have failed to demonstrate
         any such false statements.
28

procedures" for quarterly reporting.[6]  The SOX certifications provide no stand-alone basis to support Plaintiffs' deficient allegations that Impac misrepresented the status of its remediation efforts.

### 3. Plaintiffs Allege No Facts That Contradict Impac's Expectation of "Solid" Loan Production.

Plaintiffs' allegation that Impac's CEO falsely predicted continued "solid" loan production is the only new claim in the Amended Complaint.  FAC ¶¶ 79, 81-83; Opp. at 19.[7]  For the reasons set forth in Defendants' Opening Brief, this claim is perhaps the most logically flawed of any claim yet advanced.  Defs.' Mot. at 23-30.  As a mere challenge to the CEO's choice of adjectives, the claim is inactionable as a matter of law; Plaintiffs' articulation of the claim is based on an assertion of contrary facts; and the CEO's statement is protected in any event by the PSLRA's Safe Harbor, as discussed in Section 4 below.  Nothing in Plaintiffs' Opposition shows that the CEO's comment was false when made or gives any reason to suppose that this claim is salvageable.

<u>First</u>, as many courts have recognized, the CEO's positive prognosis for continued "solid" loan production is the kind of statement that investors expect to hear from corporate executives discussing the prospects of an enterprise under their stewardship, and discount accordingly.  Thus, federal courts have long held that positive descriptions such as "solid" are immaterial and inactionable under Section 10(b).  *See, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) ("statements using the word[s] 'strong,' . . . 'robust,' 'well positioned,' 'solid,' and 'improved'" about demand, results, and growth

---

[6]  Plaintiffs' observation that the last-minute changes must have been "without review by the Company's Audit Committee" is irrelevant.  Opp. at 18-19.  Plaintiffs can point to no procedure (because none exists) by which the Audit Committee must sign off on every edit to a Form 10-Q.

[7]  As quoted by Plaintiffs, the CEO said, "we continue to expect solid loan acquisitions and originations" and "we remain optimistic for continued solid loan production for 2005."  Opp. at 19.

1  strategy were vague and inactionable puffery); *In re Vantive Corp. Sec. Litig.*, 283

2  F.3d 1079, 1086 (9th Cir. 2002) (statements that sales force was "on plan" and

3  "extremely strong" were not actionable); *see* Defs.' Mot. at 27 & n.21.[8]

4         Plaintiffs argue that the principle applied in *Splash* does not apply here

5  because Tomkinson's choice of adjective, according to Plaintiffs, was "much less

6  generalized and vague" than the words used in *Splash*.  Opp. at 24.  There is no

7  meaningful distinction between use of the vague terms "strong" and "solid" to

8  describe key financial metrics and performance in *Splash*, and Tomkinson's use of

9  the word "solid."  160 F. Supp. 2d at 1076, 1077.  Tomkinson's term "solid"

10 cannot support a claim for securities fraud.

11        <u>Second</u>, underscoring this point, Plaintiffs allege that Impac's loan

12 production <u>increased</u> in the second quarter of 2005—after Tomkinson made his

13 prediction—from $4.7 billion to $5.5 billion.  Opp. at 20; FAC ¶ 64.  This fact

14 proves up Tomkinson's prediction.  Plaintiffs sweep this inconvenient piece of

15 information under the rug, however, by subjectively defining "solid" as a

16 qualitative, rather than quantitative, measure of loan production, and shifting their

17 attack to loan quality.  Opp. at 20-21.  Thus, Plaintiffs' own allegations show

18 *either* that Tomkinson's prediction was right on the mark, or that the term "solid"

19 is too vague to be actionable.  Either way, the claim fails.

20        <u>Third</u>, Plaintiffs' attack on loan quality is logically incoherent.  They

21 criticize Impac for making loans based on unspecified "fraudulent" applications

22 submitted by brokers and without verifying "stated" income (an oxymoron, as

23 "stated" income is, by definition, not "verified").  Opp. at 19-20; FAC ¶¶ 65, 66.

24

25 [8]  *See also In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d
    1069, 1087-88 (N.D. Cal. 2005) (finding CEO's statement addressing

26  company's expected resilience in the face of mounting debt to be a generalized
    statement of optimism "not capable of objective verification"); *In re Foundry*

27  *Networks, Inc., Sec. Litig.*, No. C-00-4823, 2003 U.S. Dist. LEXIS 18200, at
    *47-51 (N.D. Cal. Aug. 29, 2003) (statements that company's business

28  "remains on track" were inactionable puffery).

Plaintiffs say that these failures led to increased repurchase obligations and loss of appetite by Countrywide to buy Impac's loans.  Plaintiffs blame unidentified deficiencies in "internal control" and supposed "lack of [unspecified] compliance policies."  Opp. at 12-14; FAC ¶ 66.  These contentions, however, do not allege any misrepresentation regarding Impac's lending operations or underwriting criteria, or any misstatement in accounting for loans, loan sales, or repurchases.  Nor do they contradict the CEO's prediction of "solid" loan production.

For starters, Plaintiffs cannot fault Impac for making loans based on unverified income because this is characteristic of Alt-A mortgages, as Impac disclosed and Plaintiffs admit.  FAC ¶ 41 ("Alt-A mortgages are . . . made to borrowers whose credit is generally within typical Fannie Mae and Freddie Mac guidelines, but have underlined unverified income that make them non-conforming under those guidelines" (emphasis added)); *id*. ¶¶ 46, 63.  Likewise, Impac can hardly be faulted if brokers submitted "fraudulent" loan applications.  FE3 (Plaintiffs' source) offers no specifics to support the relevance of this assertion:  What loan applications?  How many?  Submitted by whom?  How were they fraudulent?  What happened to the loans?  What effect, if any, did these applications have on loan production?  FE3 says nothing to belie the CEO's statement.[9]

---

[9] Departing from any allegations in the Amended Complaint, Plaintiffs now argue, for the first time, that Impac's loan production was not "solid" because Impac did not verify whether borrowers were using the mortgaged property as a primary residence.  Opp. at 21.  Plaintiffs offer no details to explain how this allegation might be relevant.  The government's uniform residential loan application requires every applicant to state under penalty of perjury whether the applicant intends to use the property as his or her primary residence, as a secondary residence, or as an investment.  Defendants' Supplemental Request for Judicial Notice ("Supp. RJN") Ex. W (Freddie Mac Form 65/Fannie Mae Form 1003 (July 2005)) at 1, 5; *see also* 18 U.S.C. § 1001, *et seq.*; *United States v. Hartness*, 845 F.2d 158, 159-60 (8th Cir. 1988) (holding it is criminal offense to make materially false statement on loan application).  Of course, before the loan closes, the applicant has not yet moved into the property, so it is impossible to verify whether the applicant has lied on his loan application about the purpose of the property.  If Plaintiffs' point is that borrowers may have lied to Impac, Plaintiffs do not allege any relevant specifics of when such lies

1      Plaintiffs' allegation that Impac experienced an increase in default rates and

2  repurchase obligations also goes nowhere.  Plaintiffs do not allege that these

3  developments were unique to Impac's business (they were not), or that Impac

4  made any misrepresentations about default rates or repurchase obligations.

5  Plaintiffs also ignore Defendants' showing that Countrywide continued to buy

6  Impac's loans, contrary to the assertions of FE6 and FE7.  Defs.' Mot. at 26; RJN

7  Ex. R at R-202.  In any event, even if Plaintiffs were correct that Countrywide

8  ceased buying Impac's loans, which they are not, Plaintiffs still fail to explain how

9  *Countrywide's* unilateral buying decisions contradict any of *Impac's* disclosures.

10      Plaintiffs' attempt to blame internal control deficiencies for an alleged

11  decline in loan quality has no factual basis in the Amended Complaint.  Plaintiffs'

12  assertion that Impac had "no compliance policies" (Opp. at 20; FAC ¶ 66) is pulled

13  out of thin air:  None of the FEs purportedly say this, and Plaintiffs give no clue as

14  what "compliance policies" they mean.  Plaintiffs' attempt to tie loan quality to

15  Impac's material weaknesses over <u>accounting and financial reporting</u> is a logical

16  fallacy, as Defendants showed in their Opening Brief.  Defs.' Mot. at 14-15, 24-25.

17      As set forth in the May 16, 2006 report by Impac's auditors, the material

18  weaknesses in "internal control over financial reporting" affected <u>accounting and</u>

19  <u>financial reporting</u> of transactions.  RJN Ex. D at D-77.  The internal control

20  weaknesses that Impac reported (and ultimately remediated), <u>had nothing to do</u>

21  <u>with underlying business decisions, strategies and transactions for making loans –</u>

22  <u>but, rather, with accurately accounting for and reporting income, gains and losses</u>.

23      Plaintiffs repeatedly misuse the term "internal control" to refer to every

24  business activity they criticize.  Their quotation of the definition of "internal

25  control over financial reporting" in the federal regulations underscores their own

26

27      occurred, to what consequence, or what this has to do with "solid" loan

28  production.

error.  Opp. at 12-13.[10]  The only internal controls weaknesses alleged in the Amended Compliant are those that Impac disclosed, concerning GAAP accounting and financial reporting for complex transactions.  FAC ¶¶ 52, 54.  These weaknesses led to the accounting errors that were corrected in the 2004 Restatement, and did <u>not</u> lead to any other errors in accounting or financial reporting (and none are alleged) before the weaknesses were fully remediated at year-end 2005.  RJN Ex. Q at Q-195-196.  These internal controls weaknesses had nothing whatsoever to do with the volume or quality of Impac's loan production.

Finally, Plaintiffs suggest that the negative effects on Impac's business following the mortgage credit crisis of 2007 somehow support their contention that Impac's CEO falsely predicted continued "solid" production in May of 2005.  Opp. at 2, 22.  This mode of analysis is typical of the abusive practice of pleading "fraud by hindsight" that inspired the PSLRA and was condemned by the Ninth Circuit more than a decade ago.  *See GlenFed*, 42 F.3d at 1548 ("it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood").  Plaintiffs must allege facts showing "why the disputed statement was untrue or misleading *when made*."  *Id*. at 1549 (emphasis in original).  Plaintiffs have alleged nothing to demonstrate that the CEO's prediction of "solid" loan production was false when made.[11]

---

[10]  SEC regulations define "[i]nternal control over financial reporting" as "a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers . . . <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]</u>"  Opp. at 12-13, quoting 17 C.F.R. § 240.13a-15(f) (emphasis added).  Internal controls are designed to ensure proper accounting under GAAP—that is, appropriate records of transactions and proper authorizations for receipts and expenditures.  They are not procedures for managing the underlying business operations of the company.  *See* Defs.' Mot. at 24-25.

[11]  Plaintiffs rely on *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581 (N.D. Ohio 2004) (Opp. at 2, 22), to suggest that later events can expose an earlier misrepresentation.  In *FirstEnergy*, however, a company's post-class period filing with the Nuclear Regulatory Commission <u>admitted</u> that the company's

### 4.    The PSLRA's Safe Harbor Applies To The Forward-Looking Statements About "Solid" Loan Production.

As shown in Defendants' Opening Brief, Tomkinson's statements in May 2005, anticipating that loan production would continue to be "solid," were forward-looking and therefore protected by the PSLRA's Safe Harbor.  Defs.' Mot. at 27-30.  Plaintiffs seek to avoid this result with two meritless arguments.

First, Plaintiffs argue that Tomkinson's statements were not forward-looking because the statements implied an assertion that past loan production was "solid" which, Plaintiffs allege, was grounded in historical facts.  Opp. at 22-23.  As already discussed, even assuming the term "solid" is actionable (which it is not), Plaintiffs have not alleged any facts demonstrating that Impac's loan production was not "solid."  Indeed, Plaintiffs admit that loan production was $4.7 billion in the first quarter of 2005 on which Tomkinson was reporting.  FAC ¶ 64.

More to the point, Plaintiffs' attempt to recast Tomkinson's statements as historical is plainly incorrect.  "[A] statement predicting the company's future _expected_ sales or other financial results" falls squarely within the PSLRA's safe harbor protection.  *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) (emphasis added) (cited in Opp. at 23).  Tomkinson's statements expressed Impac's expectations regarding future loan production: "[W]e continue to expect solid loan acquisitions and originations and we are currently on track to reach $30 billion in total assets by the end of this year."  FAC ¶ 79 (emphasis added).  "[W]hile we anticipate more competition given the

---

reactor head had been corroded during the alleged class period.  316 F. Supp. 2d at 594.  This admission contradicted the company's class period statements.  *Id.* In contrast, the mortgage credit crisis was no "admission" by Impac, but a macro-economic event beyond Impac's ability to predict or control.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

REPLY IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CONSOLIDATED COMPLAINT

1  mortgage industry's 2005 outlook . . . <u>we remain optimistic for continued solid</u>
2  <u>loan production for 2005</u>."  FAC ¶ 82 (emphasis added).[12]

3       There is no way to read these statements as anything other than predictions
4  about loan production looking ahead in 2005.  Later in their Opposition, Plaintiffs
5  admit as much by characterizing Tomkinson as saying that solid loan production
6  "would in fact continue into the future."  Opp. at 24-25; *see Leapfrog*, 527 F. Supp.
7  2d at 1045; *In re Skechers U.S.A., Inc. Sec. Litig.*, No. CV-03-2094, 2004 U.S.
8  Dist. LEXIS 12570, at *24-25 (C.D. Cal. May 10, 2004) (holding CEO's statement
9  that "mark down and allowances are expected to return to normal levels" was
10 forward-looking because it "discusses what is 'expected'").

11      Given that Tomkinson's statements were forward-looking, they are not
12 actionable if either accompanied by meaningful cautionary statements or made
13 without actual knowledge of falsity.  15 U.S.C. § 78u-5(c)(1); Defs.' Mot. at 28-
14 29.  Plaintiffs do not dispute this standard.  Nor do they dispute Defendants'
15 showing that Tomkinson's statements were accompanied by meaningful cautionary
16 language.  Defs.' Mot. at 29; RJN Ex. A at A-17-20.  Accordingly, Tomkinson's
17 statements are protected by the "cautionary warnings" inlet of the Safe Harbor,
18 regardless of his alleged state of mind.  *See In re Lockheed Martin Corp. Sec.*
19 *Litig.*, 272 F. Supp. 2d 944, 949 (C.D. Cal. 2003) (the disjunctive "or" makes clear
20 that defendant need only invoke one of the Safe Harbor factors to bar a claim).

21      <u>Second</u>, apparently seeking to reduce the "state of mind" hurdle, Plaintiffs
22 argue that the standard for pleading a false statement of belief applies here.  Opp.
23 at 23.  Plaintiffs contend that Tomkinson was asserting his belief as to future loan
24 production and, accordingly, Plaintiffs need only show that he had "no reasonable
25 basis for the belief" <u>or</u> was "aware of contrary facts tending seriously to

---

[12]  The cautionary language that accompanied these statements by Tomkinson
specifically called out the words "expect" and "anticipate" as identifying
forward-looking statements.  RJN Exs. G at G-135, F at F-102.

REPLY IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CONSOLIDATED COMPLAINT

1  undermine" his statement.  *Id*.  The answer to this argument is twofold.  One, as

2  shown in the Opening Brief and Section C below, Plaintiffs have not alleged any

3  facts known to Tomkinson that would contradict his stated belief.  Indeed, as

4  noted, the increase in Impac's loan production in the second quarter of 2005

5  proved Tomkinson right.  Two, more fundamentally, the PSLRA sets the pleading

6  standard for forward-looking statements, and that standard is "actual" knowledge

7  by the speaker that the forward-looking statement is false when made.  15 U.S.C.

8  § 78u-5(c)(1)(B)(i).  Under Plaintiffs' own reasoning, if the supposed state of

9  Impac's "internal controls" precluded Tomkinson from forming a "reasonable

10  belief" as to future loan production (Opp. at 24), then he could hardly have had

11  "actual knowledge" that his prediction was false when made.  Plaintiffs' scienter

12  allegations fail for the further reasons below.

13  **C.    Plaintiffs Do Not Allege Scienter.**

14  **1.    Standard of Review**

15  To recap the relevant pleading rules, Plaintiffs' hurdle is set by the PSLRA

16  and *Tellabs*, 127 S. Ct. at 2504-05.  The alleged facts must support a "strong

17  inference" of scienter that is "cogent and at least as compelling as any opposing

18  inference of nonfraudulent intent."  *Id*.  In the Ninth Circuit, to state a claim for

19  violation of Section 10(b), plaintiffs must allege misrepresentations that are

20  "deliberately reckless or conscious" coming "closer to demonstrating intent, as

21  opposed to mere motive and opportunity."  *In re Silicon Graphics, Inc. Sec. Litig.*,

22  183 F.3d 970, 974 (9th Cir. 1999).  To allege that forward-looking statements are

23  fraudulent, the facts must strongly demonstrate <u>actual knowledge</u> that the statement

24  was false when made.  15 U.S.C. § 78u-5(c)(1).  The Court need not accept as true

25  allegations that are contradicted by matters that may be judicially noticed.  *In re*

26  *Silicon Graphics, Inc. Sec. Litig.*, No. C-96-0393, 1996 U.S. Dist. LEXIS 16989, at

27  *9 (N.D. Cal. Sept. 25, 1996).  Defendants' Request for Judicial Notice is

28

1   unopposed, and the matters submitted for judicial notice should be considered in

2   assessing the adequacy of the Amended Complaint.

3              **2.      Plaintiffs Allege No Facts Demonstrating Scienter In
                          Reporting Impac's Remediation of Internal Controls.**
4
5              Plaintiffs have pled nothing to show that any of the eight Individual

6   Defendants, or any other speaker for Impac, made a "deliberately reckless or

7   conscious" misstatement.  In dismissing Plaintiffs' original complaint, which made

8   the same allegations regarding "internal control" and scienter realleged here, this

9   Court held that the complaint "fails to allege sufficient facts to demonstrate

10  scienter."  9/19/07 Order at 1.  Nothing in the Amended Complaint or Opposition

11  suggests a different result this time around.

12             Plaintiffs lead off with a toothless observation Defendants had "actual

13  knowledge" of Impac's internal control problems.  Opp. at 29.  For once, Plaintiffs

14  are correct.  So did the rest of the world.  Impac disclosed its internal control

15  weaknesses, and the measures it was taking to remedy them, on October 14, 2004,

16  May 16, 2005, and August 9, 2005, among other occasions.  RJN Exs. D, F, C;

17  FAC ¶ 54.  Defendants shared their "actual knowledge" with investors at every

18  opportunity.  Plaintiffs ignore and thereby concede Defendants' point and

19  authorities that disclosure of this negative information is inconsistent with an

20  inference that Defendants acted with scienter.  Defs.' Mot. at 44; *see Ottmann v.*

21  *Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 348 (4th Cir. 2003) (truthful

22  disclosure of negative information militates against finding of scienter).[13]

23             Plaintiffs also concede Defendants' point that the SOX certifications signed

24  by Impac's CEO and former CFO do not support an inference of scienter.  Defs.'

25  Mot. at 36-37 & n. 31.  As many courts have held, plaintiffs must plead fraud with

26  ─────────────────
    [13]  *See also Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1261 (M.D. Fla. 2002)
27  (disclosures of unfavorable information weigh against scienter); *Ziemba v.*
    *Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (disclosure of the substance of alleged
28  "red flags" "significantly undermine any hint of fraud").

respect to alleged misrepresentations in the SOX certifications and in the underlying document.  *Id*.  The SOX certifications do not provide a shortcut for pleading scienter.  Plaintiffs must show scienter through other means.

Turning to Impac's May 16, 2005 report on its remediation efforts, Plaintiffs have not alleged that any Defendant made any "deliberately reckless or conscious" misstatement.  In order to plead scienter, Plaintiffs must put contemporaneous information that materially contradicted Impac's disclosures into the hands of Impac's representative speaker.  *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002).  Plaintiffs make only a half-hearted attempt to argue that they have adequately identified any contemporaneous documents that contradicted Impac's interim remediation disclosures.  Opp. at 28.  Plaintiffs do not identify any such documents.  Allegations that FE8 attended meetings with three of the Defendants where "spreadsheets and reports" were reviewed (*id.*; FAC ¶ 75) is insufficient as matter of law to make the required showing.  *See Vantive*, 283 F.3d at 1086 (alleged access to internal reports, without corroborating details, are insufficient to allege scienter);[14] *Lipton*, 284 F.3d at 1036 (access to unspecified internal data is insufficient to allege scienter); *Yourish v. California Amplifier*, 191 F.3d 983, 994 (9th Cir. 1999) (vague allegations of non-public confidential information is insufficient to allege scienter) (cited in Opp. at 11).  Indeed, one would expect corporate officers to attend meetings where "spreadsheets and reports" are reviewed.  Such routine business conduct obviously cannot support an inference of fraudulent intent.

Plaintiffs' rely entirely on the four FEs (FEs 1, 2, 5, and 8) who complain about Impac's management of the remediation process and lack of deference to

---

[14]   Plaintiffs attempt ineffectively to distinguish *Vantive* because that case did not rely on confidential witnesses.  Opp. at 28.  But Defendants rely on *Vantive* for a different point:  that is, vague allegations of access to internal reports are insufficient to allege scienter.  283 F.3d at 1086; Defs.' Mot. at 34.

1    their views.  Opp. at 30-31; FAC ¶¶ 58-61, 70, 73.  As already discussed, these FEs

2    do not contradict Impac's remediation disclosures, much less supply any basis to

3    infer scienter.  Defs.' Mot. at 12-13 & nn.5-6, 21-22; *see also In re H&R Block*

4    *Sec. Litig.*, No. 06-0236-CV, 2008 U.S. Dist. LEXIS 12122, at *17 (W.D. Mo.

5    Feb. 19, 2008) (holding that, where company repeatedly disclosed that corrective

6    action had been taken, confidential witnesses' testimony that company knew it had

7    accounting controls problems did not support inference of scienter).  Moreover,

8    these FEs do not claim to have communicated their views with any Defendants.

9         Plaintiffs divert attention to a straw-man argument that the FEs should be

10   given more credence than the Seventh Circuit suggested in *Higginbotham v. Baxter*

11   *Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("allegations from 'confidential

12   witnesses' must be 'discounted' . . . [u]sually that discount will be steep").  Opp. at

13   31.  This argument makes little difference in this case because the Court could give

14   the FEs all the credence in the world, yet their vague comments still would not

15   support a securities claim.  In any event, Plaintiffs' FEs' allegations are much

16   closer to those discussed in *Higginbotham* than those in the *Tellabs* remand

17   decision on which Plaintiffs rely.  In *Tellabs*, the plaintiffs had alleged 26

18   confidential witnesses, including convincing details and corroboration by multiple

19   sources.  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir.

20   2008).  Here, in contrast, Plaintiffs rely on eight FEs (four regarding remediation

21   and four regarding loan quality) who make vague generalizations and are not

22   supported by any relevant details, some of whom are contradicted by documents in

23   the public record (RJN Ex. R and R-202 (Countrywide prospectus)), none of whom

24   is effectively corroborated, and none of whom claims any relevant communications

25   with any Defendant.  These FEs cannot be worth much weight.

26

27

28

### 3. Plaintiffs Allege No Facts Demonstrating Scienter In Predicting Expectation Of "Solid" Loan Production.

In pleading Tomkinson's state of mind, Plaintiffs must do better than allege that his comments were made with "deliberately reckless or conscious" disregard for misleading investors.  Because his statements were forward-looking, Plaintiffs must allege his "actual knowledge" that Impac could not expect continued "solid" loan production in 2005.  Even setting aside the dispositive and admitted fact that Impac's loan production increased in 2005 as Tomkinson predicted, Plaintiffs come nowhere close to pleading scienter.

First, Plaintiffs do not identify any contemporaneous documents provided to Tomkinson that would contradict his statements.  *See Lipton*, 284 F.3d at 1036.  Plaintiffs point to Impac's "enhanced investor website" which, they claim, allowed Defendants (and the public) to monitor "detailed, collateral-level performance data" on Impac's loans.  Opp. at 28.  Although Plaintiffs suggest that unspecified information from this website would have shown that Impac could not expect "solid" loan production, Plaintiffs offer no information from the website, or any other source, to suggest why this would be so.  They say nothing to support an inference that Tomkinson received or obtained any such information from the website.  If any such information even existed on the website, certainly neither Tomkinson nor any other Defendant hid it from the investing public.  Plaintiffs' website allegations do not support an inference of fraudulent intent.

Second, Plaintiffs persist in an argument based on inconsistent factual assertions, even though Defendants identified the contradiction in their Opening Brief.  Defs.' Mot. at 15-16.  Plaintiffs say that Impac's internal control problems over financial reporting somehow is related to and prevented it from monitoring the quality of its loans (from which Plaintiffs argue that Tomkinson did not have a "reasonable basis" for saying that Impac expected continued "solid" loan production).  Opp. at 11-12, 20, 22, 24, 28.  On the other hand, Plaintiffs argue that

1   Impac was monitoring the quality of its loans via the "enhanced investor website"

2   (from which Plaintiffs argue that Tomkinson somehow knew all along that loan

3   production was not "solid").  *Id.* at 21, 22, 24, 26-29.  Plaintiffs cannot plead

4   scienter by alleging that Tomkinson "could not know" and yet "should have

5   known" information that supposedly contradicted his statements.  *Associated*

6   *Builders*, 505 F.2d at 100 ("Conclusory allegations and unwarranted deductions of

7   fact are not admitted as true, [citation omitted], especially when such conclusions

8   are contradicted . . . .").

9        Third, Plaintiffs argue that because Impac reported an increase in its reserves

10   for repurchase of defaulted loans in the third quarter of 2005—many months after

11   Tomkinson's statements—Tomkinson and the other Defendants knew that Impac

12   could not expect continued "solid" loan production in 2005.  Opp. at 12, 28; FAC

13   ¶ 67.  This Court need not follow Plaintiffs down this illogical rabbit hole.  Even

14   assuming that Plaintiffs correctly interpreted changes in Impac's repurchase

15   reserves (which they did not),[15] it is an impossible leap of speculation to infer that

16   a <u>later</u> increase in repurchase reserves should have been foreseen by Defendants

17   and should have signaled to them that Impac was making "bad loans" all along or

18   that loan production could not be "solid."

19        Finally, Plaintiffs misplace reliance on the four FEs who criticize Impac's

20   lending operations (FEs 3, 4, 6, and 7).  Opp. at 28; FAC ¶¶ 64-69, 71-72; *see*

21   Defs.' Mot. at 15 nn.9, 22.  FE3 complains about corporate lending culture before

22   he left in 2004 (well before the Class Period).  FAC ¶ 64.  FE4 comments in

23   exceedingly general terms that unspecified loans were going "bad" in 2005, but

24   gives no details regarding the loans, volumes, amounts, or who, if anyone, knew

---

25
26   [15]  Plaintiffs' inference that higher reserves means an increase in "bad loans" is not
        correct.  Higher reserves can reflect higher loan production in general.
27        Moreover, the factors that go into computing the repurchase reserves, which
        Defendants summarized in their Motion, are complex and not merely a
28        reflection of early borrower defaults.  Defs.' Mot. at 25 n.18.

REPLY IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CONSOLIDATED COMPLAINT

about it.  *Id.* ¶ 69.  FEs 6 and 7 make the irrelevant (and incorrect) assertion that Countrywide stopped buying loans from Impac.  *Id.* ¶¶ 71, 72; Defs.' Mot. at 15 nn.9, 26.  None of these FEs claims to have shared his or her views, or participated in any relevant communications, with Tomkinson or any other Defendant.  These failures sum up Plaintiffs' fatally deficient scienter allegations, which do not plead fraudulent intent by anyone.

### 4.    Plaintiffs' Insider Trading Allegations Do Not Support Any Inference Of Scienter.

Plaintiffs concede that allegations of insider trading are relevant only to allege motive to fraudulently inflate the stock price, and that in the Ninth Circuit, motive is not sufficient, standing alone, to plead scienter.  Opp. at 9 ("motive and opportunity are not sufficient"); Defs.' Mot. at 38.[16]  Further, because trading by insiders is normal, trading is relevant to scienter only if highly suspicious or unusual based on, for example "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  *Silicon Graphics*, 183 F.3d at 974, 986.

The facts regarding Defendants' trades are publicly reported in the Forms 4 on which Plaintiffs and Defendants both rely, and which were furnished to the Court with Defendants' unopposed Request for Judicial Notice.  RJN Exs. J-P, U; Declaration of Gal Dor ("Dor Decl.") ¶¶ 3-6.  Under *Tellabs*, in assessing the adequacy of Plaintiffs' allegations of scienter, consideration must be given to the inferences advocated by Defendants and adverse to Plaintiffs based on these trading records.  *Tellabs*, 127 S. Ct. at 2505.  The Individual Defendants' trading records support their confidence in the integrity of Impac's stock price, and flatly refute any inference of a "motive" to bail out before bad news.

---

[16]   Thus, even if Plaintiffs' mischaracterizations of Defendants' trading were accurate (which they are not), the trading allegations would not plead scienter.

1

### a.  Plaintiffs Overstate Defendants' Net Sale Proceeds.

2    Plaintiffs make the same incorrect mathematical assertions that they made in

3  their original complaint, even though Defendants have pointed out the errors in

4  every brief filed to date.  *See* Defs.' Mot. at 38-44.  Plaintiffs misleadingly assert

5  that the Individual Defendants sold stock during Class Period for gains of $5.4

6  million.  Plaintiffs ignore that Defendants exercised options to <u>buy</u> at substantial

7  expense all of the stock that they sold.  The collective <u>net</u> gains on sale were less

8  than half the amount that Plaintiffs allege, or approximately $2.4 million.  Defs.'

9  Mot. at 39; Dor Decl. ¶¶ 3-4.

10    Regardless of the gross amount, however, stock sales proceeds are of little

11  relevance in assessing a seller's motive.  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d

12  430, 445 (S.D.N.Y. 2005).  "The significance of insider transactions in the scienter

13  analysis is what, if anything, they suggest about the likely intent of the insiders.

14  The gross proceeds, standing alone, tell us very little."  *Id.*  Here, the overall

15  circumstances of Defendants' trading suggest a "likely intent" was to exercise

16  expiring options while remaining strongly invested in Impac's stock.

17

### b.  The Percentage of Defendants' Sales Do Not Support An Inference Of Scienter.

18    Plaintiffs' incorrectly contend that Defendants sold "between 20% and 91%"

19  of their holdings.  Opp. at 32.  In calculating these percentages, Plaintiffs disregard

20  Defendants' retention of vested and exercisable options.  *See* Defs.' Mot. at 39-41

21  & n.36.  Contrary to Plaintiffs' argument that vested options should be ignored

22  (Opp. at 32-33), it is well settled in the Ninth Circuit that vested options must be

23  considered in calculating total holdings to determine the proportion sold.  *See*

24  *Silicon Graphics*, 183 F.3d 970 at 986-87 ("Actual stock shares plus exercisable

25  stock options represent the owner's trading potential more accurately than the

26

27

28

REPLY IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CONSOLIDATED COMPLAINT

1   stock shares alone.").[17]  Because all of the shares sold by the Defendants were

2   based on the exercise of vested stock options (RJN Exs. J-P, U), Plaintiffs' math

3   would count these options in determining Defendants sales, but unfairly ignores

4   them in determining Defendants' total holdings.  Plaintiffs' position is indefensible

5   under *Silicon Graphics* (183 F.3d at 986), and Plaintiffs' authorities do not support

6   their math.  Opp. at 32.  Neither *In re Secure Computing Corp.*, 184 F. Supp. 2d

7   980, 989 (N.D. Cal. 2001), nor *No. 84 Employer-Teamster Joint Council Pension*

8   *Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003),

9   reached the issue of how to calculate total holdings in assessing motive based on

10  percentage of sales.  Ninth Circuit law is uncontradicted that vested options should

11  be included in determining sales as a percentage of total holdings.

12              **c.    Defendants Increased Their Holdings During the**
                        **Class Period, Countering An Inference of Scienter.**

13          As illustrated in the chart on page 40 of Defendants' Opening Brief, all of

14  the Defendants increased or maintained their stakes in Impac during the Class

15  Period by retaining more vested options than they exercised and sold.  Defs.' Mot.

16  at 40-41.  Plaintiffs try to downplay this fact by suggesting that stock holdings are

17  somehow irrelevant unless Defendants bought stock "in open market transactions."

18  Opp. at 33-34.  The District Court in *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp.

19  2d 358, 383 (E.D.N.Y. 2003) rejected this very argument:  "[D]efendants'

20  retention of the shares so acquired [by vesting of options] remains inconsistent

21  with the allegation that defendants harbored information" regarding financial

---

24  [17]  *See also In re IMPAX Labs., Inc. Sec. Litig.*, No. C-04-4802, 2006 U.S. Dist.
25  LEXIS 81420, at *25 (N.D. Cal. Mar. 1, 2006) (holding plaintiff "exaggerate
      the magnitude of insider trading . . . in erroneously excluding non-exercised
26  exercisable options from the total number of shares owned"); *In re Astea Int'l,*
      *Inc. Sec. Litig.*, No. 06-1467, 2007 U.S. Dist. LEXIS 58238, at *42 n.18 (E.D.
27  Pa. Aug. 8, 2007) (including exercisable stock options as part of defendant's
      holding when calculating percentage of stock sold, in "recognition of options as
28  a common form of compensation for corporate executives").

1    problems.[18]  It is beyond dispute that the Defendants increased their holdings by

2    retaining stock and options that they might have sold for profit.  Defs.' Mot. at 40-

3    41.[19]  This fact clearly cuts against Plaintiffs' inference that the Defendants tried to

4    "dump" their holdings on secret knowledge that bad news was coming.  Opp. at 34.

5            Plaintiffs also try to downplay the fact that Tomkinson did not sell <u>any</u>

6    shares during the Class Period, but increased his ownership by exercising options

7    and holding the stock.  Defs.' Mot. at 43-44.  Plaintiffs respond weakly that insider

8    trading is not required to demonstrate scienter.  Opp. at 35 n.5.  Tomkinson,

9    however, is not just any insider; he is the CEO and Impac's leading spokesman.

10   The fact that he increased his holdings shows he had confidence in the integrity of

11   the stock price and undercuts any inference of scienter.  *See KeySpan*, 383 F. Supp.

12   2d at 383-84 (the fact that CEO did not sell shares, even though he made most of

13   the alleged misstatements and was well-positioned to reap profits from insider

14   knowledge, weighed against an inference of scienter); *Astea*, 2007 U.S. Dist.

15   LEXIS 58238, at *41-43 (declining to infer scienter when CEO exercised options

16   that were due to expire and did not sell any of his shares).

17

18

19

20   [18]  *See also Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58-59 (E.D.N.Y.
     1998) (despite large class-period sales, larger acquisitions derived from
21   defendants' exercise of options countered any inference of scienter); *In re PEC
     Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005) (no inference of
22   scienter when defendants exercised options but did not sell stock during).

23   [19]  Plaintiffs' assertion that some of the options that became exercisable during the
     Class Period were "underwater" (Opp at 34 & n.4) is a red herring because, as
24   Defendants have made clear, their calculations exclude "underwater," or "out-of-
     the-money," options.  Defs.' Mot. at 40, n.35; Dor Decl. ¶ 6(a).

25   Further, Plaintiffs' statement that options granted to Defendants in 2002, 2003,
     and 2004 were "underwater" during the Class Period is not accurate.  Opp. at
26   34.  No grants from 2002 or 2003 were underwater.  *See* RJN Exs. J-P, U. The
     Forms 4 show strike prices for the July 30, 2002 grant of $10.95 and July 29,
27   2003 grant of $14.27.  *Id.*  Impac's stock price during the Class Period ranged
     from $16.37 to $22.07, as reflected in publicly available stock reports.  Supp.
28   RJN Ex. X.

REPLY IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CONSOLIDATED COMPLAINT

### d.    The Timing Of Defendants' Trades Was Not Unusual Or Suspicious.

Plaintiffs feign surprise that Defendants' stock sales occurred a few days after Impac's public report on May 16, 2005, of its first quarter 2005 results.  Opp. at 34.  But one would normally expect insiders to have an open window to trade shortly after a public report.  That is when the public is on a level playing field with respect to material financial and operating results, and insiders presumably have no advantage of knowing material non-public information.  Defs.' Mot. at 41-42 & n.37; *Guttman v. Huang*, 823 A.2d 492, 503-04 (Del. Ch. 2003) (finding that timing of trades was consistent with inference of a normal corporate open trading window).  Plaintiffs admit that Defendants exercised at least some stock options that were about to expire.  Opp. at 34; Defs.' Mot. at 41-43.  Plaintiffs assert that less than half of the exercised options were about to expire, but overlook that all of the options exercised by Tomkinson, Johnson, and Filipps on July 15, 2005, May 23, 2005, and June 15, 2005, respectively, would have expired on July 27, 2005.  RJN Exs. O, K, U.

In considering whether the timing of sales is "suspicious," the relevant chronology is not whether sales come after positive news, but how closely sales are followed by negative news.  *See Lipton*, 284 F.3d at 1037 (insiders' sales after announcement of positive quarterly results did not give rise to inference of scienter); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (sales three months before disclosure of bad news was too attenuated to draw inference of scienter); *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 685 (N.D. Cal. 2002) (sales two months before bad earning results did not support strong inference of scienter); *BISYS*, 397 F. Supp. 2d at 444 (sales that are "not clustered [at the end of the class period], when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted" are not suspicious).

Plaintiffs allege that the negative news emerged with Impac's August 9, 2005 press release reporting the second quarter of 2005. FAC ¶ 93. One Defendant sold stock on June 15—nearly two months before the August 9 report—and all other sales were made in May 2005, almost three months before. *Id*. ¶ 118. The timing of these sales clearly was not suspicious. Moreover, the sales coincided with when one would expect there to be a conservative open trading window—*i.e.*, before the results of the quarter ending on June 30 would be fully digested and reported to the public, which was on August 9. The timing of Defendants' sales does not support an inference of suspicious trading.

> **e.     Defendants' Stock Sales Were Not Suspiciously Out of Line with Prior Trading History.**

Defendants cogently explained the two-year hiatus from trading before May 2005 as the logical result of an extended blackout period running from anticipation of the 2004 Restatement. Defs.' Mot. at 42. In fact, Impac's August 9, 2005 Form 10-Q confirms this blackout period in noting that employees were prohibited from exercising options due to the delayed filing of Impac's 2004 SEC Form 10-K/A (which was filed on May 16, 2005). Defs.' Mot. at 42-43; RJN Ex. C at C-77. It stands to reason that trading by Impac's officers was likewise delayed. While Plaintiffs attack this explanation as a mere "inference" (Opp. at 35-36), it is a reasonable inference from the alleged and judicially noticeable facts. Other courts routinely consider allegations of suspicious timing of trades in light of reasonable inferences about normal corporate trading windows. *See* Defs.' Mot. at 42-43 & n. 37; RJN Ex. C at C-77; *Party City*, 147 F. Supp. 2d at 312 ("[t]rading following public announcements simply evidences compliance with the securities laws").

Taken together, Plaintiffs' trading allegations and the public trading records demonstrate that the Individual Defendants maintained or increased their stake in Impac during the Class Period, that they were blacked out from trading until after May 16, 2005, that a large number of their options were set to expire on July 27,

2005, that they traded during a normal open window between May 19 and June 15, 2005, months before the negative disclosure on which Plaintiffs base their fraud claim, and that the CEO purchased and did not sell any shares.  These facts counter any inference of scienter and support an inference of the Individual Defendants' good faith belief in the integrity of Impac's stock price.

### f.    Performance-Based Compensation Does Not Support Any Inference of Scienter

Plaintiffs' argument that Defendants' performance-based compensation supports a "strong inference" of scienter can be summarily dismissed.  Courts routinely reject such allegations without debate.  Ordinary executive compensation cannot support an inference of fraudulent intent.  *See*, *e.g.*, *IMPAX*, 2006 U.S. Dist. LEXIS 81420, at *28-29 (holding "legitimate motives concerning compensation as tied to financial performance are shared by virtually all corporations and their officers" and are insufficient to support a strong inference of scienter); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (incentive-based compensation is "possessed by most corporate directors and officers" and is therefore insufficient to support an inference of scienter).  Such allegations "are too generic to support an allegation of fraud."  *BISYS*, 397 F. Supp. 2d at 444.[20]

_____

[20]  Plaintiffs rely on fact-specific cases involving executive compensation that have no application here.  Opp. at 36.  In *In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998), *aff'd*, 14 Fed. Appx. 714 (8th Cir. 2001), a district court in Minnesota declined to adopt a bright-line rule that executive compensation is never relevant to scienter, but listed many factors needed to support a strong inference of scienter before considering executive compensation.  In *America West*, the court upheld plaintiffs' allegations of motive based on unique facts regarding the timing of stock option grants.  320 F.3d at 944.  The court rejected allegations that ordinary executive compensation arrangements support scienter.  *Id*. at 944-45 (rejecting as insufficiently particularized the allegations based on golden parachute provisions in employment contracts and incentive compensation plans).

### 5.   Plaintiffs Fail To Allege Corporate Scienter

Plaintiffs have not alleged that any corporate representative of Impac made any fraudulent misstatement on behalf of Impac. As Plaintiffs concede, absent such allegations, they have not pled scienter against Impac. Opp. at 37.

### D.   Plaintiffs Cannot Plead Loss Causation

Plaintiffs state how they must allege loss causation: They must allege a misrepresentation, an economic loss, and the causal connection between the two. Opp. at 38, *Dura*, 544 U.S. at 347. Plaintiffs identify alleged misrepresentations: Tomkinson's statements about "solid" loan production on May 13 and May 16, 2005, and Impac's list of remedial measures on May 16, 2005. They identify the alleged economic loss: the drop in stock price on August 9, 2005. But they give absolutely no indication of a causal connection between the two. Plaintiffs simply declare that the loss "was a direct result of defendants' fraudulent scheme" and that it occurred when "defendants' prior misrepresentations about the Company's internal controls and derivative reporting were revealed along with the details of the fraudulent scheme." Opp. at 38; FAC ¶ 133.

Impac's August 9 press release, however, did not correct anything that Impac previously said about loan production or remedial measures. FAC ¶ 93; Defs.' Mot. at 45-46.[21] To the contrary, the August 9 press release and Form 10-Q repeated the allegedly false statements without correction or apology. Defs.' Mot. at 46. On August 9, 2005, Tomkinson said, "the Company's operating businesses continued to show solid gains in terms of acquisitions and origination activity and credit performance." FAC ¶ 91 (emphasis added). In the Form 10-Q for the second quarter of 2005, Impac listed the same remediation measures it had

---

[21] Likewise, Plaintiffs characterize the June 28, 2005 earnings announcement as a *partial* disclosure reflecting Defendants' efforts to "walk the stock down." Opp. at 40, citing FAC ¶ 91. The June 28, 2005 announcement, however, was also completely silent on the topics of loan production and remediation.

1    disclosed in the allegedly false May 16, 2005 From 10-Q, with a few updates, and

2    disclosed again that Impac's internal control were still ineffective.  *Id*. ¶ 94.

3          While Plaintiffs' action has many fatal flaws, this one is particularly deadly.

4    Plaintiffs have not identified any misrepresentation or omission that was corrected

5    thereby triggering any drop in the stock price at the close of the Class Period.

6    Without a corrective disclosure, there is no causation.  The enabling premise of a

7    securities fraud claim is that investors who buy stock during the Class Period

8    unwittingly pay a stock price that is artificially inflated by the Defendants'

9    fraudulent misrepresentations.  *In re VeriSign, Inc. Deriv. Litig.*, 531 F. Supp. 2d

10   1173, 1203 (N.D. Cal. 2007).  Their losses are the decline in stock price, or

11   deflation, that occurs when the market absorbs a corrective disclosure.  *Dura*, 544

12   U.S. at 347.  Here, there was no corrective disclosure.

13         The "loss" that Plaintiffs seek to recover from Defendants is the decline in

14   stock price that resulted from market forces—*i.e.*, Impac's announcement that its

15   second quarter results had been negatively affected by adverse interest rates,

16   unprecedented mortgage loan prepayment speeds, and other industry-wide factors,

17   and that investors should expect lower dividends.  FAC ¶¶ 93-95.  This volatility

18   was a risk of Plaintiffs' investment.  It was not the result of any misrepresentation

19   or omission about Impac's internal controls, remediation efforts, or expected loan

20   production in 2005.  Defendants respectfully submit that this fatal flaw marks an

21   appropriate end of the road for this case.

22         **E.    Plaintiffs Have Not Pled Control Person Liability**

23         Plaintiffs' Section 20(a) claim must be dismissed as to all Individual

24   Defendants because Plaintiffs fail to allege a primary violation of Section 10(b)

25   and have not pleaded facts demonstrating that any of the Individual Defendants

26   possessed the requisite control to dictate a primary violator's conduct.  Defs.' Mot.

27   at 46-47.  Plaintiffs' Opposition does not respond.  Accordingly, the Section 20(a)

28

1   claim must be dismissed as to all Defendants.  *See ZZZZ Best*, 1989 U.S. Dist.

2   LEXIS 8083, at *9.

3   **IV.    CONCLUSION**

4       For the forgoing reasons, Impac respectfully requests that the Court dismiss

5   the First Amended Complaint with prejudice.

6   Dated:  April 10, 2008

7                                              By         /s/ Pamela S. Palmer
                                                     Pamela S. Palmer

8                                              LATHAM & WATKINS LLP
                                                     Miles N. Ruthberg
9                                                    Peter W. Devereaux
                                                     Pamela S. Palmer
10                                                   Michele D. Johnson
                                                     Gal Dor
11
                                               Attorneys for Defendants
12

13

14

15

16

17

18

19

20   OC\947313.1

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of 18 years and not a party to this action.  My business address is Latham & Watkins LLP, 650 Town Center Drive, 20th Floor, Costa Mesa, CA  92626-1925.

On April 10, 2008, I served the following document described as:

**REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CONSOLIDATED COMPLAINT**

by serving a true copy of the above-described document in the following manner:

## BY U.S. MAIL

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service.  Under that practice, documents are deposited with the Latham & Watkins LLP personnel responsible for depositing documents with the United States Postal Service; such documents are delivered to the United States Postal Service on that same day in the ordinary course of business, with postage thereon fully prepaid.  I deposited in Latham & Watkins LLP' interoffice mail a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service:

SEE ATTACHED SERVICE LIST

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **April 10, 2008**, at Costa Mesa, California.

/s/ Jana Roach
Jana Roach

**Service List**
**Re: Impac Mortgage Holdings, Inc.**

| | |
|---|---|
| Bruce G. Murphy<br>Law Offices of Bruce G. Murphy<br>265 Llwyds Lane<br>Vero Beach, FL  32963<br>(772) 231-4202<br>(772) 234-0440 (Fax) | Jonathan M. Plasse<br>Christopher J. Keller<br>Shelley Thompson<br>Labaton Sucharow & Rudoff LLP<br>100 Park Avenue, 12th Floor<br>New York, NY  10017-5563<br>(212) 907-0700<br>(212) 818-0477 (Fax) |
| Christopher Kim<br>Lisa J. Yang<br>T. Oliver Yee<br>Lim Ruger & Kim LLP<br>1055 West Seventh Street, Suite 2800<br>Los Angeles, CA  90017<br>(213) 955-9500<br>(213) 955-0511(Fax) | Brian Oliver O'Mara<br>Lerach Coughlin Stoia Geller Rudman<br>& Robbins LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA  92101<br>(619) 231-1058<br>(619) 231-7423 (Fax) |
| Jeff S. Westerman<br>Karen T. Rogers<br>Sabrina S. Kim<br>Milberg Weiss Bershad & Schulman<br>LLP<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, CA  90071<br>(213) 617-1200<br>(213) 617-1975 (Fax) | Karen Hanson Riebel<br>Lockridge Grindal Nauen P.L.L.P.<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN  55401<br>(612) 339-6900<br>(612) 339-0981 (Fax) |
| Arthur L. Shingler III<br>Scott + Scott, LLC<br>600 B Street, Suite 1500<br>San Diego, CA  92101<br>(619) 233-4565<br>(619) 233-0508 (Fax) | Marc A. Topaz<br>Richard A. Maniskas<br>Tamara Skvirsky<br>Schiffrin & Barroway, LLP<br>280 King of Prussia Road<br>Radnor, PA  19087<br>(610) 667-7706<br>(610) 667-7056 (Fax) |